[No. 8835. Department Two. October 10, 1910.]

H. W. MANGOLD, *Appellant*, v. ADRIAN IRRIGATION COMPANY, *Respondent*.[1]

CORPORATIONS—PROMOTERS—FRAUD. A promoter of a corporation who sought to make exorbitant profit, at the expense of investing stockholders, by the sale to the corporation of land held under option without any actual investment, cannot recover from the corporation on the ground of fraud because the corporation refused to perform the contract and after forfeiture of the option bought the land direct at a low figure; since promoters owe the utmost good faith to stockholders and are accountable for secret profits.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered November 17, 1909, dismissing an action for fraud, upon withdrawing the case from the consideration of the jury after a challenge to the sufficiency of the evidence. Affirmed.

*L. H. Prather*, for appellant.

*William E. Richardson*, for respondent.

CROW, J.—This action was commenced by H. W. Mangold against Adrian Irrigation Company, a corporation, to recover damages arising out of the alleged fraudulent acts of the defendant, by which the plaintiff was induced to part with certain interests which he claimed to hold and which he alleged the defendant thereafter obtained and converted to its own use. After the plaintiff had introduced his evidence, the trial judge sustained a challenge to its sufficiency, and dismissed the action. The plaintiff has appealed.

The only question presented for our consideration is whether the trial judge erred in sustaining the challenge. The following facts were shown: On January 1, 1907, O. E. Loving and M. R. McMahon, owners of 4,765.56 acres of land in Douglas county, entered into a written contract with one C. F. Berlet, for its sale to him for $23,827.80, or

[1]Reported in 111 Pac. 173.

about five dollars per acre, payable in five annual install-ments, four of $5,000 each, and one of $3,827.80, the first installment of $5,000 to fall due January 1, 1908. No cash payment other than one year's advance interest at six per cent was made by Berlet. The contract by its terms provided that time should be of its essence, and that it might be for-feited at the election of the vendors for nonpayment of any in-stallment when due.

On July 10, 1907, C. F. Berlet and the appellant, H. W. Mangold, entered into a written preliminary agreement for a sale of the land to Mangold, it being then contemplated by them that Mangold, with other persons to be interested by him, should promote the organization of a corporation to procure water rights, irrigate, and sell the land. Shortly thereafter Mangold conferred with one Lichty and several other parties in Spokane, hereafter mentioned as promoters and trustees, with the result that he and they verbally agreed to organize and promote the defendant corporation for the purpose of improving, irrigating, and selling the land. On or about September 5, 1907, Mangold filed and posted notices of water right locations in Douglas county, doing so in his own name but in realty as trustee for the promoters and the respondent corporation, his expenses being paid by them. On November 8, 1907, he transferred these water rights to James Erickson, one of the promoters, as trustee for the corporation. On October 1, 1907, Mangold entered into a written agreement with Berlet for an option to purchase the land for $18.75 per acre, two dollars per acre to be paid on or before November 7, 1907, and the remainder in five years, except that payments were to be made to Loving and McMahon out of the $18.75 per acre in accordance with the terms of their contract with Berlet. No cash payment was made by Mangold, but time for the first payment was afterwards extended by Berlet to December 7, 1908. The promoters caused the corporation to be organized, stock, sub-

scriptions to be taken, the land to be examined by irrigation experts, and surveys to be made.

About the same time, Mangold and all the other promoters entered into an agreement whereby the land was to be sold to the corporation by Mangold for $30 per acre, the corporation to pay such purchase price from the proceeds of its capital stock sold to investing subscribers. It was further agreed that $18.75 per acre was to be then paid to Berlet, $3.12½ per acre to Mangold, and $8.12½ to the promoters. The corporation had no funds in sight or available with which to pay the $30 per acre, other than receipts from stock subscriptions, none of which were paid by appellant or the promoters. No payment of the $30 per acre, or any part thereof, was made by the corporation to Mangold, nor did Berlet pay Loving and McMahon. On January 2, 1908, after the contract of sale from Loving and McMahon to Berlet, and Mangold's option had lapsed and been forfeited, the respondent corporation, through its trustees, purchased the land from Loving and McMahon for about five dollars per acre.

It will be observed that, under the agreement of appellant and the promoters, Loving and McMahon, original owners of the land, were to receive only about five dollars per acre out of the $30 per acre, which the appellant now contends should have been paid by the respondent corporation; that Berlet was to receive a profit of about $13.75 per acre; that Mangold was to receive a profit of $3.12½ per acre, and that the promoters were to receive a profit of $8.12½ per acre, all at the expense of the investing stockholders.

Appellant insists that the trustees conspired to prevent the taking up of his option before December 8, 1907; that they did so in order that it might lapse, and that they might then be enabled to purchase the land from Loving and McMahon for five dollars per acre. The substance of his contention is that the corporation and its trustees fraudulently prevented him from securing profits which he would

have realized had they taken up his option and paid $30 per acre, and that they committed a tort in so doing, for which the corporation should respond to him in damages. It is upon this theory that he asks judgment.

It seems to us that a mere statement of the facts is sufficient to sustain the judgment of the trial court. Appellant paid nothing for the land. He made the water locations in trust for the company. He did not own them, although he claims he did. He testified that he agreed to subscribe for the entire capital stock of the corporation. Assuming that he did, it does not appear that he actually made the subscription, or that he paid for the stock, either in money or by transferring to the corporation any title to the land. He had no title to convey. The promoters had paid nothing for the land. It was to be purchased with funds of the stockholders at an exorbitant figure, if we measure its value by the price at which Loving and McMahon were willing to sell, and actually did thereafter sell. The only apparent purpose of a purchase at $30 per acre by the corporation was to aid appellant and the promoters in realizing excessive profits from the stockholders, on property which the promoters did not own and in which neither they nor the appellant had any funds invested. The evidence shows, that most of the promoters became trustees of the corporation; that upon learning the land could probably be purchased for five dollars per acre, they concluded to obtain it if they could at that price, and thereafter ask that the stockholders determine what compensation, if any, the promoters and appellant should receive for services rendered. Appellant objected to this proposition. He insisted upon the payment of the agreed purchase price of $30 per acre out of the stockholders' money, and now contends that he has been defrauded by the corporation and its trustees. In support of his asserted right to recover, he cites: *Inland Nursery & Floral Co. v. Rice*, 57 Wash. 67, 106 Pac. 499; *Old Dominion Copper Mining & Smelting Co. v. Lewisohn*, 210 U. S. 206.

We need not question the law announced in these cases, as it has no application to the facts before us. In each of the cases cited the promoters of whom complaint was made, by or on behalf of the parties who subsequently acquired the stock, had, as such promoters, transferred to the corporation in exchange for stock, and at an excessive valuation, property to which at the time they had title. In this case it was proposed that the corporation should actually purchase the land with money of the stockholders, and thus enable the appellant, who held an option only, was without title, and had not invested a dollar, to obtain an enormous profit at their expense and to their prejudice. None of the promoters had paid for any of the stock, although they had subscribed. The money in the treasury of the respondent corporation had been collected from the investing public, and the promoters, who were trustees of the corporation, held it for the use and benefit of the stockholders.

The question as to how far promoters may go in obtaining profits for themselves at the expense of a corporation is not always one of easy solution. The courts generally deal with promoters as trustees, and require them to act with the utmost good faith. They cannot be permitted to reap a harvest of secret profits for themselves at the expense of existing stockholders whose funds have provided financial support for the corporate enterprise. If, without the knowledge or consent of such stockholder, the promoters cause funds of the corporation to be so disbursed as to secure undisclosed profits to themselves, they may be called to account. In *Camden Land Co. v. Lewis*, 101 Me. 78, 95, 63 Atl. 523, the court well said:

"Promoters of a corporation stand in a fiduciary relation to the corporation and to its subscribers for stock, and to those who it is expected will afterwards buy stock from the corporation. The promoters owe to them the utmost good faith. And if they undertake to sell their own property to the corporation they are bound to disclose the whole truth re-

specting it. If they fail to do this, or if they receive secret profits out of the transaction, either in cash or by way of allotments of stock, when there are other stockholders, or it is expected that there will be other holders of new and additional stock, undoubtedly the corporation may elect to avoid the purchase; or it may hold the promoters accountable for the secret profits, if in cash; or may require a return of the stock if unsold; or if sold, an accounting for the profits of its sale."

See, also, *Mason v. Carrothers* (Me.), 74 Atl. 1030.

It does not appear from the evidence before us that the stockholders who had paid their money into the corporation, with possibly one or two exceptions, had any knowledge of, or had consented to, the proposed plan by which appellant and the promoters would make such large profits on the land for themselves, and at the expense of the corporation. Had they discovered the facts, they could have prevented the consummation of such a deal, or after its completion could have compelled restitution. Yet the appellant now insists that the trustees defrauded him by not completing the purchase at $30 per acre with funds in the treasury, the proceeds of stock subscriptions made by investors other than the promoters. The trustees did what they were entitled to do, and what they should have done. The appellant is not entitled to recover in this action.

The judgment is affirmed.

RUDKIN, C. J., CHADWICK, DUNBAR, and MOUNT, JJ., concur.